NOT DESIGNATED FOR PUBLICATION

No. 127,113

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of J.R., a Minor Child.

MEMORANDUM OPINION

Appeal from Lyon District Court; LAURA L. MISER, judge. Submitted without oral argument. Opinion filed August 30, 2024. Affirmed.

*David M. Braun*, of Braun Law, LLC, of Topeka, for appellant natural mother.

*Meghan K. Morgan*, assistant county attorney, and *Marc Goodman*, county attorney, for appellee.

Before GARDNER, P.J., GREEN and HILL, JJ.

PER CURIAM: We are called on to determine whether the district court properly held that J.R., a minor child, was a child in need of care (CINC) under K.S.A. 2023 Supp. 38-2202(d)(1) and (d)(2). Mother claims that the district court's holding lacked sufficient evidence because she had adequate housing, took J.R. to therapy, communicated with J.R., and took care of his well-being by having him live with J.C., his half-brother's mother. For reasons stated later, we reject these contentions and affirm.

FACTS

On September 1, 2023, the State filed a petition alleging that J.R. was a child in need of care. Affidavits attached to the petition alleged that J.R. was without adequate parental care, control, or subsistence and the condition was not due solely to the lack of financial resources; without the care or control necessary for the child's physical, mental,

or emotional health; and was physically, mentally, or emotionally abused or neglected or sexually abused. The affidavits also set out factual allegations that Mother had left J.R. in the care of J.C. since April 2, 2023, after J.R. and Mother had gotten into an argument that ended with Mother pushing J.R. into a wall. J.R. resided with J.C. between April 2, 2023, and August 30, 2023, when she went to the police to claim Mother had abandoned J.R. in her care. J.R. was afraid to return to Mother's custody for fear of not having housing, food, or running water. J.R. had also reported that Mother "'use[d] to hit me and has choked me at least three times.'"

A temporary custody hearing was held on September 5, 2023, where J.R. was placed into the custody of the Department for Children and Families (DCF). The adjudication hearing was held on October 19, 2023. The State called four witnesses to testify at the hearing.

Patrick Renfro was an officer with the Emporia Police Department on August 30, 2023. Renfro encountered J.C. when she walked into the police department wanting to report Mother for fraud and abandonment. When J.C. contacted the police, she had not had contact with Mother in "three to four weeks." Mother did not grant J.C. any legal authority over J.R. when he was left in her care.

Officer Renfro contacted J.R. at school. J.R. told Renfro that Mother had taken him to stay with J.C. because the apartment they were living in did not have running water. Renfro could not locate Mother because she did not have a current address.

J.C. testified that her son and J.R. have the same father. On April 2, 2023, J.R. contacted J.C. to pick him up because he and Mother had been arguing and "she was being physical with him." In "the middle of April at some time" J.R. was placed into DCF custody while he resided with J.C. but was removed from custody on June 2, 2023. Even after being removed from DCF custody, J.R. continued to reside with J.C. because

2

Mother "did not have a place of residence to take [J.R.]." J.C. and Mother had sporadic contact that came in waves of "good" and "bad" contact. Mother occasionally picked up J.R. to take him to therapy.

J.C. tried to get Mother to establish a timeline for when she would acquire housing and take J.R. back into her custody, but to no avail. Mother had provided no kind of financial support for J.C. to care for J.R. Around August 2023, mail in Mother's name began to unexpectedly show up at J.C.'s address. That prompted J.C. to go to the police on August 30, 2023, to report Mother's inappropriate use of her mailing address. J.C. reiterated that Mother had not given her any legal authority over J.R., so she could not make any educational or medical decisions for him. To her knowledge, Mother had not found adequate housing while J.R. was in her care.

On cross-examination with the guardian ad litem, J.C. conceded that Mother had purchased around fifty dollars' worth of groceries and a few items of clothing for J.R. between April and August 2023. J.C. had discussed a guardianship or custodianship with Mother, but Mother would not agree. At least once while J.R. was with J.C., Mother told J.C. that she was suicidal.

J.R. testified that he had been living with J.C. for five months when she reported the situation to the police on August 30, 2023. While staying with J.C., J.R. blocked Mother from contacting him on the phone because he was scared that she would try to hit him or manipulate his words. He was also afraid that she would not have a job, would "be lazy again," or would "try to live off" their relatives. During that time, J.R. saw Mother "probably like once every two months maybe." He would avoid having to see her and avoided returning to her custody because he was scared. In August 2023, J.R. and Mother texted back and forth about a new apartment that Mother claimed to have found, but J.R. never saw the apartment. J.R. did not know where Mother was living on August 30, 2023.

Savannah Potter, a child protection specialist with DCF, was the final witness. Sometime in June or July 2023, Mother had an apartment but "there was a comment made about not having running water," so DCF provided Mother with a hotel for a few days. After J.C. reported the situation to police on August 30, 2023, Mother eventually provided DCF workers an address to an apartment building but without an apartment number. An internet search of the address showed that it was not a real address. No one affiliated with DCF or the State attempted to drive by the address to personally verify it. Potter did not recommend J.R.'s release into Mother's custody because she did not have a home, because she was not communicating, because she did not have a plan, and because J.R. did not want to live with her. Communication with Mother terminated "[o]nce the CINC case was opened" because Mother told Potter "not to contact her anymore."

Mother presented no evidence at the hearing.

After hearing the evidence and closing arguments from counsel, the district court ruled from the bench that clear and convincing evidence showed that J.R. had been placed with J.C., who was not his legal guardian, for a significant period. J.C. had not been granted legal authority over J.R., and Mother had continually pushed the uncertainty of finding a home further and further back. J.R. was afraid of Mother for hitting and manipulating him to say, "certain things." Mother did not provide an address "that appeared to be . . . valid" and that witnesses supported her lack of housing. The court emphasized that Mother would have no need to use J.C.'s mailing address if she had housing of her own.

The district court concluded the State met its burden to show that J.R. was without adequate care, control, or subsistence which was not due solely to Mother's lack of financial resources, and to show that J.R. was without the care or control necessary for his physical, mental, or emotional health. The district court determined that J.R. had not been abandoned because Mother had done "the bare minimum" to place J.R. in J.C.'s

4

care. No determination was made that Mother abused, neglected, or sexually abused J.R. The court ruled that J.R. needed care and placed him in DCF custody. A journal entry reiterating the ruling from the bench was filed on October 19, 2023.

Mother timely appealed.

ANALYSIS

*Whether the district court properly ruled that J.R. needed care under K.S.A. 2023 Supp. 38-2202(d)(1) and (d)(2)*

To begin, the district court must find clear and convincing evidence to adjudicate a child as a child in need of care. K.S.A. 38-2250; K.S.A. 2023 Supp. 38-2202(d). Clear and convincing evidence is evidence that shows the truth of the facts asserted is highly probable. *In re B.D.-Y.*, 286 Kan. 686, 695-96, 187 P.3d 594 (2008). A single statutory ground, if proved, is legally sufficient to support a CINC determination. See *In re F.C.*, 313 Kan. 31, 44, 482 P.3d 1137 (2021) (affirming CINC adjudication where evidence supported one of two statutory grounds on which district court relied).

An appellate court reviews the district court's adjudication of a child in need of care by determining whether, after reviewing the evidence in the light most favorable to the State, a rational fact-finder could have found it highly probable, by clear and convincing evidence, that the child was in need of care. The appellate court does not reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.,* 286 Kan. at 705. To the extent Mother's claim raises a question of statutory interpretation, this court exercises unlimited review. *In re N.E.*, 316 Kan. 391, 402, 516 P.3d 586 (2022).

5

Here, the district court adjudicated J.R. as a child in need of care under the definitions found in K.S.A. 2023 Supp. 38-2202(d)(1) and (d)(2), which include a child who:

> "(1) Is without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of the child's parents or other custodian; [and]
>
> "(2) is without the care or control necessary for the child's physical, mental or emotional health."

The temporal scope of the circumstances to be considered under each statutory criterion is based on the plain language used. *In re F.C.*, 313 Kan. at 37; *In re D.H.*, 57 Kan. App. 2d 421, 430, 453 P.3d 870 (2019). Because subsections (d)(1) and (d)(2) are framed in the present tense, the determination depends on "a view of the child's present circumstances existing on the day of the adjudication hearing." 57 Kan. App. 2d 421, Syl. ¶ 4.

Much of the focus at the adjudication hearing and on appeal was on whether Mother had adequate housing. Mother argues that she reported to DCF a valid address. She acknowledges Potter, or another DCF employee, did an internet search that showed the address was invalid, but argues that someone with DCF should have driven by the address to verify it personally. Thus, Mother claims that DCF did not conduct an adequate investigation on the matter and the district court's finding that Mother did not have adequate housing was unsupported by the evidence.

Mother's argument is not persuasive. First, it ignores much of the State's evidence. J.C. testified that Mother left J.R. in her care while looking for housing and that to her knowledge Mother never found housing. J.R. testified that he did not know where Mother was living when he stayed with J.C. Although J.R. texted Mother about a new apartment she claimed to have found, he had never seen it himself. Officer Renfro testified that J.R.

6

said his last apartment with Mother did not have running water. Renfro tried to contact Mother but could not because she did not have a current address. Potter testified that although Mother had given her an address, an internet search showed it was not real. In addition, the district court emphasized J.C.'s testimony that she received Mother's mail to find that if Mother had housing, she would not have needed to have her mail sent to J.C.'s address. So, the district court placed significant weight on J.C.'s testimony. This court will not reweigh the evidence on appeal. *In re F.C.*, 313 Kan. at 40. In sum, every witness testified that Mother did not have a verifiable address, that they did not know where Mother was living, or that Mother failed to find housing. Thus, the district court considered far more than just Potter's testimony about the internet search.

Mother's only argument to rebut the State's evidence is her claim that she gave a valid address to DCF and DCF failed to adequately investigate that address. But this argument ignores that DCF performed an internet search on the address and found that it did not exist, and that even if DCF drove by as Mother suggests, the address would still not be verifiable. Mother gave DCF the address to an apartment but did not provide an apartment number. Even if DCF had driven by the building and found that the address was real, driving by would not reveal which unit Mother lived in or that she lived in a unit at all. Thus, on the date of the adjudication hearing Mother had not provided DCF with a verifiable address even if, for the sake of argument, DCF could have investigated further. And Mother did not attempt to present evidence at the hearing showing that she had adequate housing at any time while J.R. lived with J.C. or while this case was pending. So, she rebuts none of the State's evidence.

Mother next argues that she took J.R. to therapy, enrolled him in school, and arranged for him to live with J.C. while she looked for housing. Then, Mother implies that this evidence is enough to preclude the district court's finding. But Mother again ignores a significant amount of evidence presented at the hearing. Mother stopped communicating with J.C. for three or four weeks before J.C. contacted the police. J.R.

was scared to talk to or see Mother for fear of being hit, manipulated, or going without adequate housing. J.R. had been living with J.C. from April 2, 2023, to August 30, 2023, and J.C. was not granted any legal, decision-making authority over J.R. While Mother bought groceries once and a few clothing items, she did not otherwise offer J.C. or J.R. any financial support. In the light most favorable to the State, this evidence supports a ruling that Mother was unwilling or unable to provide subsistence for J.R. Mother's lack of consistent communication and physical contact and J.R.'s fear of talking to and being around Mother also allows an inference that her failure to provide parental care and subsistence was for more than purely financial reasons. And as discussed above, the evidence shows that Mother lacked adequate housing to provide the level of subsistence that a minor needs.

K.S.A. 2023 Supp. 38-2202(d)(2) provides that a minor child is in need of care when that child "is without the care or control necessary for the child's physical, mental or emotional health."

The parties argue the same evidence addressed above. Mother claims that "[n]o evidence was presented at trial suggesting that [she] was unable to provide for J.R.'s physical health and it was established that [she] was able to support J.R.'s mental and emotional health through individual therapy." This argument ignores the record. Explained previously, much of the hearing focused on Mother's lack of housing, or at least Mother's failure to provide verifiable proof of housing. All four of the State's witnesses testified to some iteration that Mother left J.R. with J.C. because she did not have housing, or they did not know where Mother was living. That evidence has been discussed above and need not be reasserted here. In sum, a rational fact-finder could find it highly probable that Mother lacked adequate housing or at least failed to provide verifiable proof of adequate housing.

Certainly, the lack of adequate housing—or any housing at all—would harm a child's physical, mental, or emotional health. See *In re A.W.*, No. 125,129, 2023 WL 598370, at *5-6 (Kan. App. 2023) (unpublished opinion) (generally applying a mother's lack of housing to K.S.A. 38-2202[d][1], [2], and [3]). Indeed, J.R.'s fear of leaving J.C.'s care for Mother's included a fear that Mother was "going to not have a job . . . she's gonna be lazy again . . . she will just try to live off her own friends, [and] live off my aunt." In the light most favorable to the State, J.R.'s fears show that Mother's inability or lack of desire to find a stable living situation had affected J.R.'s mental and emotional health and would continue to do so.

Otherwise, as discussed above, the district court heard evidence that J.R. was afraid that Mother would hit him and manipulate him and would lack means to care for him. Mother's communication with J.C. and J.R. was sporadic, and she told DCF to cease communication with her after the CINC case was initiated. J.R. was placed with J.C. for an extended period, and J.C. lacked authority to make medical or educational decisions for J.R. And at no point did Mother communicate a plan with J.C. or DCF for when she could assume control and care for J.R. This evidence, in the light most favorable to the State, supports a finding that Mother lacked the care and effort necessary to support J.R.'s physical, mental, or emotional health.

Although Mother focuses on facts favorable to her argument such as how she took J.R. to therapy occasionally, or texted J.R. in August 2023, she overlooks the substantial evidence of her shortcomings—evidence that Mother did not try to refute at the hearing. And in selectively arguing the evidence, Mother essentially asks this court to reweigh contradicting evidence in her favor, which this court will not do. *In re F.C.*, 313 Kan. at 40. Nor does Mother support her arguments with citation to analogous caselaw. Instead, she supports her arguments with conclusory assertions that she "had the tools and assistance necessary to help care for J.R."

Here, clear and convincing evidence showed that it is highly probable that J.R. needed care in accordance with K.S.A. 2023 Supp. 38-2202(d)(1) and (d)(2).

Affirmed.